# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| CHRISTINE M. CAMPBELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:09-CV-00245 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Christine Campbell appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Campbell applied for DIB and SSI on August 11, 2004, alleging that she became disabled as of September 3, 2003. (Tr. 104-14.) The Commissioner denied her application initially and upon reconsideration, and Campbell requested an administrative hearing. (Tr. 33-34, 76-85.) A hearing was conducted by Administrative Law Judge ("ALJ") Bryan Bernstein on May 23, 2007, at which Campbell (who was represented by counsel), her daughter, and a vocational expert

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

("VE") testified. (Tr. 424-58.)

On September 17, 2008, the ALJ rendered an unfavorable decision to Campbell, concluding that she was not disabled because she could perform a significant number of jobs in the economy despite the limitations caused by her impairments. (Tr. 15-31.) The Appeals Council denied Campbell's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-11, 420-23.)

Campbell filed a complaint with this Court on August 27, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) Her sole argument on appeal is that the ALJ improperly evaluated the opinion of Dr. Randall Schroeder, her treating mental health counselor. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-17.)

## II. FACTUAL BACKGROUND[2]

*A. Background*

At the time of the ALJ's decision, Campbell was fifty-one years old, had a high school education and one year of college in culinary arts, and possessed work experience as a cafeteria manager. (Tr. 12, 104, 117, 227, 328.) She alleges that she became disabled as of September 3, 2003, due to major depressive disorder; generalized anxiety disorder; obsessive compulsive disorder; pain disorder associated with a general medical condition; polyarthralgias secondary to underlying degenerative joint disease; osteoarthritis in multiple sites, including the hands, cervical spine, lumbosacral spine, and knees; and fibromyalgia. (Opening Br. 2.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 458-page administrative record necessary to the decision.

2

### B. Campbell's Testimony at the Hearing

At the hearing, Campbell testified that she lives with her husband and two daughters in their own home. (Tr. 436.) She stated that her family does all the grocery shopping and almost all of the housework, though she cooks dinner two nights a week. (Tr. 436.) Campbell reported that she drives a car and goes to church twice a month. (Tr. 447.) She also enjoys playing guitar. (Tr. 448.)

As to her daily routine, Campbell testified that after she gets up in the morning and takes her medications, she sits in a recliner for an hour and drinks coffee, trying to focus on one thing that she hopes to accomplish that day. (Tr. 439.) After an hour in the recliner, Campbell goes back to bed because "the pain is so bad." (Tr. 439.) She then lies down for "[a]nywhere from one to five hours" until her medications start working, and then she might get up and try to do the one chore that she has set as her goal for the day. (Tr. 439, 444-45.) After she completes her chore, she goes back to bed and often stays in bed "all night." (Tr. 446-47.)

Campbell testified that she experiences pain throughout her spine, but that her low back pain is what limits her activity. (Tr. 440-42.) She stated that she also experiences significant stabbing pain "from the inside out" in her shins and "fire pain" in her knees and feet when she lies down at night, which affects her sleeping. (Tr. 442.) She also states that she has difficulty concentrating on a task.[3] (Tr. 450-51.)

### C. Summary of the Relevant Medical Evidence

Campbell was treated by Dr. Charles Sanders from December 2002 through February

---

[3] Campbell's daughter also testified at the hearing, essentially corroborating Campbell's testimony. (Tr. 451-53.)

2004 for her complaints of arthritis. (Tr. 249-61.) He diagnosed her with polyarthralgias secondary to underlying degenerative joint disease with a possible psychosomatic and fibromyalgia-type component; osteoarthritis in multiple sites, including her hands, knees, and spine; history of low back pain; and question of soft tissue rheumatism or chronic pain syndrome. (Tr. 249-61.) He thought that her arthralgias were related to anxiety and stress and that her complaints appeared out of proportion with the examination results. (Tr. 250, 256.)

Campbell was also seen by Dr. E. Jon Brandenberger from September 2003 through April 2007 for a variety of ailments, including chronic pain, anxiety, nausea, crying spells, depression, and difficulty sleeping. (Tr. 352-410.) In 2003, Dr. Brandenberger referred her to Parkview Behavioral Health for mental health care. (Tr. 363.) Campbell was evaluated by Dr. Frank Shao, a psychiatrist, on December 1, 2003. (Tr. 264-68.) He assigned her a diagnosis of major depressive disorder, remitted, and obsessive compulsive disorder. (Tr. 268.)

Campbell participated in thirty-two physical therapy sessions from February through June 2004 due to her complaints of pain. (Tr. 288-315.) She made only minimal improvements, and the physical therapist found her subjective complaints to be inconsistent with the objective findings. (Tr. 288, 301-02.) Upon discharge, the therapist noted that her pain appeared intractable and that most of her therapeutic goals had not been met. (Tr. 288.)

Campbell returned to Dr. Shao in April 2004. (Tr. 266.) He documented that she had rapid speech, was jittery, and that her mood was openly depressed. (Tr. 266.) He saw her several more times in 2004, and observed that she was anxious, had pressured speech, and was physically focused. (Tr. 264-65.) He determined that her major depression was mostly remitted, and that she had an obsessive compulsive and anxiety disorder. (Tr. 264.) He questioned her

4

compliance with her medications. (Tr. 264.)

On April 30, 2004, Campbell was seen by Dr. Gregory Hoffman for a surgical consultation concerning her neck and thoracic pain. (Tr. 281-82.) He noted that MRI results and x-rays showed fairly significant degenerative disk disease at C5-6 and C6-7 and generalized degenerative disk disease in the thoracic spine. (Tr. 281.) He explained that surgery is not generally indicated for degenerative disk disease and referred her to a physiatrist for a conservative care program. (Tr. 281.)

Campbell was seen by Dr. Shantanu Kulkarni in May and June of 2004 for neck, thoracic, and occasional low back pain. (Tr. 277-78.) He diagnosed her with cervical degenerative disk disease with protrusion at C6-7, right-sided neck pain with cervical spondylosis, thoracic disk protrusion, and low back pain. (Tr. 278.) He recommended that she undergo injections and continue her current medications. (Tr. 278.) A week later she reported that her neck pain was seventy-five percent improved. (Tr. 273.)

On September 16, 2004, Campbell was evaluated by Dr. Venkata Kancherla at the request of the Social Security Administration. (Tr. 316-18.) Upon physical examination, he found that her range of motion was painful but not restricted. (Tr. 317.) That same month, Dr. J. Sands, a state agency physician, reviewed Campbell's record and concluded that she could lift or carry up to ten pounds frequently and up to twenty pounds occasionally; stand or walk for at least six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. (Tr. 320-27.)

On September 27, 2004, Campbell underwent a consultative psychological examination by Sherwin Kepes, Ph.D. (Tr. 328-31.) He noted that she was evidencing some signs of

5

generalized anxiety and depression, as well as anhedonia, social isolation, pessimism, irritability, tearfulness, feelings of guilt, and low self-esteem. (Tr. 331.) He assigned her a Global Assessment of Functioning ("GAF") score of 48,[4] and diagnosed her with major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and pain disorder associated with a general medical condition. (Tr. 331.)

One month later, B.R. Horton, Psy.D., reviewed Campbell's record and concluded that she had a moderate limitation in activities of daily living; a moderate limitation in maintaining concentration, persistence, or pace; and mild difficulties in maintaining social functioning. (Tr. 332-48.) He found that she had the ability to perform simple, repetitive tasks despite her mental limitations. (Tr. 348.) Dr. Horton's opinion was later affirmed by a second state agency psychologist. (Tr. 348.)

Campbell saw Randall Schroeder, Ph.D., for twenty-three counseling sessions from January 2005 to December 2006. (Tr. 367-406.) He observed that she had pressured speech, experienced fatigue, and was emotionally drained due to her physical problems. (Tr. 367-70, 406.) He noted that she had stress and a loss of energy because she was caring for her ninety-one year old aunt. (Tr. 406.) She also complained of chronic pain and flashbacks of past trauma. (Tr. 395-96.) In July 2006, she reported that her nightmares were better since her sleep had improved. (Tr. 390.) In December 2006, she reported that her depression had increased and that she was sleeping eighteen hours a day. (Tr. 389.)

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

More than four months later, on May 15, 2007, Dr. Schroeder completed a report on Campbell's mental condition. (Tr. 412-15.) He stated that she is often seriously depressed and unable to function physically, and that her psychiatric condition exacerbated her experience of pain. (Tr. 413.) His prognosis was that due to her physical and emotional problems, she would not be able to return to work. (Tr. 414.) He further opined that Campbell would miss more than four days of work per month due to her mental impairments. (Tr. 415.)

Campbell returned to Dr. Shao in May 2005. (Tr. 381.) He observed that she was agitated, exhibited rapid speech and flight of ideas, and had an urge for alcohol and drugs. (Tr. 381.) He diagnosed her with mood disorder and rule out bipolar disorder and narcotic medicine dependence and mild withdrawal. (Tr. 381.) She reported at her next two visits that she was doing better. (Tr. 379-80.) In November 2005, Campbell reported that she had some intrusive thoughts, and Dr. Shao diagnosed her with mood disorder, obsessive compulsive disorder, and alcohol dependence. (Tr. 379.) She returned to Dr. Shao in February 2006, reporting increased anxiety. (Tr. 377.) He noted that she was noncompliant with medications. (Tr. 377.) In August 2006, Campbell stated that she was doing "ok", and he diagnosed her with major depressive disorder versus bipolar disorder and alcohol dependence in remission. (Tr. 375.)

Campbell saw Dr. Stephen Hatch three times between February and July 2006. (Tr. 384-87.) He diagnosed her with diffuse musculoskeletal pain, arthritis, and fibromyalgia. (Tr. 387.) He noted that her options were somewhat limited and that she likely would not benefit from any interventional procedures. (Tr. 387.) He adjusted her medications to include a long-acting pain medication, and in July 2006 she reported that she was doing quite well. (Tr. 385.) In May 2007, Dr. Hatch opined that Campbell could lift or carry less than ten pounds occasionally; could stand

7

or walk less than two hours in an eight-hour workday; must periodically alternate between sitting and standing; was limited in pushing or pulling with her upper and lower extremities; and should never climb kneel, crouch, or crawl. (Tr. 417-19.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to

8

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

9

*B. The ALJ's Decision*

On September 17, 2008, the ALJ rendered his opinion. (Tr. 15-31.) He found at step one of the five-step analysis that Campbell had not engaged in substantial gainful activity since her alleged onset date and at step two that she had severe impairments. (Tr. 17.) At step three, the ALJ determined that Campbell's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 17-19.) Before proceeding to step four, the ALJ determined that Campbell's testimony of debilitating limitations was not reliable and that she had the RFC to perform a limited range of light work. (Tr. 19, 23.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Campbell was unable to perform any of her past relevant work. (Tr. 26.) The ALJ then concluded at step five that Campbell could perform a significant number of jobs within the economy, including laundry folder, hand trimmer, and hand packager. (Tr. 26-30.) Therefore, Campbell's claims for DIB and SSI were denied. (Tr. 31.)

*C. Analysis*

Campbell's sole argument on appeal is that the ALJ improperly evaluated the opinion of Dr. Schroeder, her treating mental health counselor. Specifically, Campbell argues that the ALJ should have assigned greater weight to Dr. Schroeder's opinion that she would miss more than four days of work per month due to her mental impairments and thus that she was disabled.

To begin, Campbell acknowledges that while Dr. Schroeder has a Ph.D., he is not a licensed or certified psychologist, but rather, a licensed clinical social worker and family counselor. (Tr. 25.) Consequently, Campbell concedes that Dr. Schroeder is not an "acceptable medical source" under the regulations but rather is an "other source" and thus should be

evaluated according to the following factors: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment; and (6) any other facts that tend to support or refute the opinion. SSR 6-03p (citing 20 C.F.R. §§ 406.1527(d), 416.927(d)); *see Sydow v. Astrue*, No. 3:06-CV-540 RM, 2009 WL 362309, at *4-5 (N.D. Ind. Feb. 10, 2009) (discussing the difference under the regulations concerning the opinion of an "acceptable medical source" versus an "other source"); *Smith v. Astrue*, No. 07-C-0955, 2008 WL 794518, at *6 (E.D. Wis. Mar. 24, 2008) (same).

Here, contrary to Campbell's assertion, the ALJ properly considered Dr. Schroeder's opinion in accordance with the foregoing factors. He began by noting Dr. Schroeder's specialty—that is, that he is a pastor, has a Ph.D. in family therapy from Chicago Theological Seminary and a master's degree in divinity, and is a licensed clinical social worker and licensed marriage and family therapist. (Tr. 8.) The ALJ also observed that Campbell saw Dr. Schroeder for individual therapy sessions from January 2005 through December 2006, and thus he considered the length and frequency of the counseling relationship. (Tr. 18, 25.)

In fact, the ALJ mentioned or discussed Dr. Schroeder *five different times* in his decision. (*See* Tr. 18, 20, 21, 25.) The ALJ took special note of Dr. Schroeder's opinion that Campbell was disabled. (Tr. 25.) However, he chose to discount this opinion because Dr. Schroeder does not meet the requirements of a "treating source" and at the time he rendered this opinion, he had not seen Campbell in the previous four months and did not even know what medications she was

11

on. (Tr. 25.) The ALJ further observed that Dr. Schroeder's notes dealt more with Campbell's domestic and financial problems than with her symptoms of depression, and he also considered the fact that Campbell actively participated in hobbies and social activities, including speaking at church and initiating a pain management group, during the time that Dr. Schroeder claimed she was disabled. (Tr. 25.) Thus, the ALJ gave ample reasons for his decision to discount Dr. Schroeder's opinion. *See, e.g.*, *Cooper v. Astrue*, No. 1:06-CV-1175-JDT-TAB, 2007 WL 2904069, at *4 (S.D. Ind. Sept. 7, 2007) (affirming the ALJ's discounting of the opinion from an "other source" where the ALJ adequately considered the factors outlined in SSR 06-03p).

Nevertheless, Campbell asserts that "[s]everal of the[] [relevant] factors favor Dr. Schroeder's opinion," in particular, the length and frequency of the treatment relationship, and complains that the ALJ "does not mention any of the other factors" or the weight assigned to them. (Opening Br. 16.) Campbell's argument is a non-starter, amounting to nothing more than a plea to re-weigh the evidence with the hopes that it will come out in her favor this time. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence"). Not only did the ALJ discuss the length and frequency of Dr. Schroeder's treating relationship with Campbell, he also considered Dr. Schroeder's specialty and education and the fact that his notes dealt more with problems arising from Campbell's domestic and financial situation than her symptoms of depression. Thus, the ALJ did indeed discuss several of the factors identified in Social Security Ruling 06-03p to evaluate a health care provider who is not an "acceptable medical source".

Not to be deterred, Campbell also attacks several of the reasons provided by the ALJ to

discount Dr. Schroeder's opinion. She contends that the ALJ should not have discounted his opinion on the basis that she was no longer seeing Dr. Schroeder and that he did not know what medications she was taking at the time. This argument, however, is a mere attempt to nitpick the ALJ's analysis of the evidence before him. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). An ALJ is entitled to consider the fact that Dr. Schroeder's opinion of disability came more than four months after his last session with Campbell at a time when he was unaware of her current medication regime. *See* SSR 06-3p (explaining that one factor to consider is "[t]he degree to which the source presents relevant evidence to support an opinion") (citing 20 C.F.R. §§ 404.1527(b), 416.927(b)). Therefore, Campbell's nitpicking of the ALJ's analysis of Dr. Schroeder's opinion does little to undermine the ALJ's thorough consideration of his opinion.

In short, the ALJ's consideration of the opinion of Dr. Schroeder, who Campbell concedes does not meet the requirements of an "acceptable medical source", is supported by substantial evidence. As a result, Campbell's request for a remand will be DENIED, and the Commissioner's final decision will AFFIRMED.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Campbell.

SO ORDERED. Enter for this 28th day of July, 2010.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge